*Pablo Javier Aleman v. State of Maryland*
No. 60, September Term 2019


**Criminal Procedure – Interstate Compacts – Interstate Agreement on Detainers – Temporary Custody of Prisoner**. When a detainer based on pending criminal charges in one state is lodged against a person serving a prison sentence in another state, the Interstate Agreement on Detainers ("IAD") provides for the transfer of the prisoner from the jurisdiction of incarceration to the "temporary custody" of the jurisdiction where charges are pending. That temporary custody is for the purpose of resolving those charges, after which the prisoner is returned to the place of incarceration. Temporary custody under the IAD does not encompass a commitment of the prisoner to the Department of Health under Maryland Code, Criminal Procedure Article, §3-112 (if the charges are resolved by a verdict of "not criminally responsible") before the prisoner is returned to the state of incarceration.


**Criminal Procedure – Interstate Compacts – Interstate Agreement on Detainers – Application to Defendant Found Not Criminally Responsible**. Article VI(b) of the IAD states that the IAD and its remedies do not apply to "any person who is adjudged to be mentally ill." A verdict of "not criminally responsible," which is a finding that the defendant was mentally ill at the time of the crime, does not by itself trigger Article VI(b), as it does not necessarily relate to the defendant's current mental status.

IN THE COURT OF APPEALS
OF MARYLAND

No. 60

September Term, 2019

_____

PABLO JAVIER ALEMAN

V.

STATE OF MARYLAND

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by McDonald, J.
Watts and Getty, JJ., dissent.

_____

Filed: June 30, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case calls upon us to construe the Interstate Agreement on Detainers ("IAD"). The IAD is a congressionally-sanctioned compact among the states designed to facilitate the prompt disposition of a detainer lodged by one state against a person incarcerated in another state. In particular, the IAD allows for the temporary transfer of the prisoner from the state of incarceration to the state in which charges are pending, upon the request of either the prisoner or the prosecuting jurisdiction.

Shortly after commencing an 11-year sentence in Ohio for felony assault, Petitioner Pablo Javier Aleman requested a transfer under the IAD to Maryland where a murder charge was pending against him in the Circuit Court for Baltimore County. After he arrived in Maryland, Mr. Aleman pled guilty to second degree murder but, as permitted by Maryland law, requested a jury trial on the issue of criminal responsibility. The jury returned a verdict of "not criminally responsible." Such a verdict ordinarily requires that a defendant be committed to the Department of Health for treatment or released. However, the State maintained that, because Maryland had obtained only temporary custody of Mr. Aleman from Ohio, the IAD required that he first return to Ohio to finish his sentence. Mr. Aleman sought to remain in Maryland, but the Circuit Court denied his petition for habeas corpus seeking such relief. Mr. Aleman appealed and the Circuit Court stayed his return to Ohio, as well as a commitment to the Department for treatment, pending his appeal.

On appeal, Mr. Aleman argued that the Maryland statute providing for commitment to the Department superseded the State's obligation under the IAD to return him to Ohio. He also argued that the not criminally responsible verdict exempted him from the IAD by the terms of the compact itself. The Court of Special Appeals rejected both arguments and,

after carefully analyzing the IAD and other relevant statutes, affirmed the Circuit Court's denial of Mr. Aleman's habeas corpus petition. We agree with that analysis and disposition.

## I

## Background

This case concerns the intersection of two laws: (1) an interstate compact concerning the disposition of detainers based on criminal charges – the IAD – codified in Maryland as Maryland Code, Correctional Services Article ("CS"), §8-401 *et seq.*, and (2) the State law concerning the consequences of a not criminally responsible verdict, codified as Maryland Code, Criminal Procedure Article ("CP"), §3-112. To place the facts of this case in their legal context, we first outline the provisions of the IAD and the State statutes concerning the mental health status of a defendant in a criminal case, including CP §3-112.

### A.     *The Interstate Agreement on Detainers*

#### 1.     Interstate Detainers

As pertains to the IAD, an interstate detainer has been described as "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction."[1] Prosecuting authorities in the

---

[1] *Stone v. State*, 344 Md. 97, 108 (1996) (quotation marks and citations omitted). Although the IAD itself does not define "detainer," congressional reports concerning the IAD used this definition. *See* H.R. Rep. No. 91-1018 (1970); S. Rep. No. 91-1356 (1970). In other contexts, a detainer may be based on a pending charge for violation of parole or probation or a sentence already imposed against the prisoner in another jurisdiction, as well as pending criminal charges. *See Carchman v. Nash*, 473 U.S. 716, 719 (1985). The IAD,

2

jurisdiction where the charges are pending may file a detainer with the institution in the jurisdiction where the prisoner is incarcerated to ensure that the prisoner, upon completing the term of incarceration, will be available to answer the pending charges.

Prior to enactment of the IAD, there was no uniform method for managing an interstate detainer and resolving the charges on which it was based. Moreover, a detainer could be lodged without proof of the underlying charges, a judicial officer was not involved in issuing it, and the filing of a detainer did not obligate the jurisdiction that lodged it to take any further prosecutorial action. *Pitts v. North Carolina*, 395 F.2d 182, 187-88 (4th Cir. 1968). As a result, there sometimes arose "a practice of filing detainers based on untried criminal charges that had little basis." *Carchman v. Nash*, 473 U.S. 716, 729 (1985). This created the potential for abuse in which a detainer could be lodged against a prisoner, adversely affect the circumstances of the prisoner's current incarceration,[2] and later be withdrawn as the prisoner came to the end of that sentence. Even apart from the

---

however, pertains only to detainers based on untried indictments, informations, or complaints.

[2] A congressional report summarized the concerns about the potential deleterious impact of an unresolved detainer that led to the creation of the IAD:

> [A] prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing.

S. Rep. No. 91-1356 (1970).

effect of a detainer on a prisoner's treatment in the place of incarceration, there was also a concern that the charges on which a detainer was based should be resolved "before the passage of time has dulled the memory or made witnesses unavailable." S. Rep. No. 91-1356 (1970).

2.      Adoption of the IAD to Reform the Interstate Detainer System

In 1948, the Joint Committee on Detainers ("Joint Committee"), an ad hoc group of law enforcement and corrections associations, was formed to address the problems posed by the detainer process. The Joint Committee issued a report that recommended certain basic principles for the use and disposition of detainers. Among those basic principles were that detainers should be disposed of "as promptly as possible," that "[n]o prisoner should be penalized" as a result of a pending detainer until it had been investigated and found valid, and that jurisdictions should observe principles of comity in settling detainers and disposing of pending charges. *See* Council of State Governments, Suggested State Legislation, Program for 1957, at 74-75 (1956) ("Council of State Governments Report"). With respect to the transfer of a prisoner from the place of imprisonment to the place where charges were pending, the Joint Committee included the following basic principle:

> *There should be assurance that any prisoner released to stand trial in another jurisdiction will be returned to the institution from which he was released.* An important cause of long-standing detainers is the presence of unsettled charges pending against a prisoner held by another jurisdiction. If the charges appear to be valid and if the individual is to be brought to trial before completion of his sentence, then it is essential that the institution holding him in custody be assured of his return after the trial has been completed. Unless there is such assurance, many jurisdictions will understandably hesitate to cooperate.

4

*Id*. at 75 (emphasis in original). The principles stated by the Joint Committee served as the foundation of the IAD when, a few years later, the Council of State Governments drafted legislative proposals concerning detainers, including the IAD.[3] *See id.* at 78-85.

Congress had assented in 1934 to the creation of such a compact. *See* 4 U.S.C. §112(a); *see also Cuyler v. Adams*, 449 U.S. 433, 438-42 & n.9 (1981). As a congressionally-sanctioned compact, the IAD falls within Article I, §10, cl. 3 of the United States Constitution and thus qualifies as a federal law.[4] *Id.* Forty-eight states and the District of Columbia have adopted the IAD. *See* National Center for Interstate Compacts, Interstate Compacts – Agreement on Detainers, available at https://perma.cc/X9N5-UMNK. The federal government itself became a party to the compact in 1970. Pub. L. 91-538, 84 Stat. 1397.

Maryland became a party to the compact in 1965. Chapter 627, §1, Laws of Maryland 1965.

3. The Interstate Transfer Process under the IAD

The IAD is organized as nine "Articles" designated by roman numerals – *i.e.*, Article I, Article II, etc. – which, in Maryland, correspond to sections of the Correctional

---

[3] Another proposed law dealt with the disposition of detainers arising within the state where a prisoner was located and was called the Uniform Mandatory Disposition of Detainers Act. Council of State Governments Report at 74-78.

[4] In the Court of Special Appeals, the parties were asked to brief the question whether the IAD, as a federal law, would preempt other state statutes such as CP §3-112 that might pertain to Mr. Aleman's situation. 242 Md. App. 632, 644 n.9 (2019). Both parties have also addressed preemption in their briefs to us. Ultimately, the intermediate appellate court found it unnecessary to reach that issue to decide this case, as do we.

Services Article of the Maryland Code.[5] Cases in various jurisdictions construing the IAD generally refer to the provisions of the IAD by their Article designations. Accordingly, we shall use those designations in the text of this opinion and cross-reference the Maryland Code analogs in footnotes, as appropriate.

For purposes of this case, the key provisions of the IAD can be summarized as follows.

*Underlying Policy*

The first Article of the IAD sets forth the problem that the compact was intended to address and the means of addressing that problem. Article I.[6] It briefly refers to the fact that unresolved detainers based on outstanding charges can "obstruct programs of prisoner treatment and rehabilitation." *Id.* Accordingly, the IAD is intended "to encourage the expeditious and orderly" disposition of detainers based on untried charges. *Id*. To that end, the IAD provides "cooperative procedures." *Id.* The last Article of the IAD states that it is to be "liberally construed so as to effectuate its purposes." Article IX.[7]

---

[5] When the General Assembly enacted the law by which the State joined the compact, the IAD was codified in the Maryland Code as Article 27, §616A *et seq*. In 1999, it was recodified as part of the then-new Correctional Services Article. Chapter 54, Laws of Maryland 1999.

[6] CS §8-403.

[7] CS §8-411.

*Lodging the Detainer*

The IAD applies when a state in which there are untried charges pending against an individual imprisoned in another state lodges a detainer with the state in which the individual is imprisoned. The IAD uses the phrase "receiving state" to refer to the jurisdiction that has pending charges against the individual and that lodges a detainer. It uses the phrase "sending state" to refer to the jurisdiction where the individual is already incarcerated and the detainer is lodged. Article II(b), (c).[8]

*Initiating a Transfer to the Receiving State*

After a detainer is lodged, a transfer of the prisoner[9] from the sending state to the receiving state under the IAD can be initiated in two ways: (1) by the prisoner or (2) by the state in which charges are pending – *i.e.*, the receiving state.

First, Article III provides that a prisoner subject to a detainer may initiate a transfer. The official in charge of the prisoner in the place of incarceration – *i.e.*, the sending state – must inform the prisoner of the source and contents of any detainer, as well as of the prisoner's right to request final disposition of the untried charges in the receiving state. Article III(c).[10] The prisoner may then request a final disposition of the pending charges.

---

[8] CS §§8-404(b), (c).

[9] The IAD uses the term "prisoner" to refer to the person who is the subject of a detainer based on pending charges in one state while incarcerated in another state. For clarity, we will generally use the same term.

[10] CS §8-405(c).

7

Article III(a)-(b).[11] The prisoner's request is "deemed to be a waiver of extradition" with respect to proceedings on the pending charges in the receiving state. Article III(e).[12] Such a request also constitutes consent "to the production of the prisoner's body in any court where the prisoner's presence may be required in order to effectuate the purposes of [the IAD] and a further consent voluntarily to be returned to the original place of imprisonment in accordance with the provisions of [the IAD]." *Id.* Finally, the request is deemed to be a waiver of extradition for the prisoner's later return to the receiving state to serve any sentence imposed on those charges in that state after the prisoner completes the current term of imprisonment in the sending state. *Id.*

Second, Article IV provides that, regardless of whether the prisoner requests final disposition of the pending charges, the jurisdiction in which charges are pending may also initiate a transfer. To do so, the receiving state may request "temporary custody or availability" of the prisoner to stand trial. Article IV(a).[13] The receiving state's request for transfer of the prisoner must be approved, recorded, and transmitted by the court having jurisdiction over the pending charges in the receiving state. *Id.* In this situation, where the prisoner has not initiated the transfer, the governor of the state in which the prisoner is located may decline to allow the requesting state to have temporary custody of the prisoner. *Id.* In addition, the prisoner has an opportunity to contest the transfer. Article V(d).

---

[11] CS §§8-405(a)-(b).

[12] CS §8-405(e).

[13] CS §8-406(a).

In either case, if the transfer proceeds, the sending state – the place of incarceration – is to offer to deliver "temporary custody" of the prisoner to the receiving state for a "speedy and efficient prosecution." Articles V(a).[14] And, in either case, the authorities in the sending state are to provide a certificate stating the term of the prisoner's incarceration, the time already served, the time remaining on the term, the amount of good time earned, when the prisoner is eligible for parole, and any parole-related decisions concerning the prisoner. Articles III(a), IV(b).[15]

*Custody of the Prisoner in the Receiving State*

Among other things, Article V of the IAD establishes parameters for a prisoner's stay in the receiving state and eventual return to the sending state. Of particular relevance to this appeal, Article V provides that the receiving state's custody of the prisoner is "temporary" and limited in nature – it "shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations, or complaints that form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction." Article V(d).[16] Moreover, Article V states that "[f]or all purposes other than that for which temporary custody as provided in [the IAD] is exercised, the prisoner shall be deemed to

_____

[14] CS §8-407(a).

[15] CS §§8-405(a), 8-406(b).

[16] CS §8-407(d).

9

remain in the custody of and subject to the jurisdiction of the sending state." Article V(g).[17]

Finally, "[a]t the earliest practicable time consonant with the purposes of [the IAD], the prisoner shall be returned to the sending state." Article V(e).[18] As is evident, Article V establishes that the receiving state's custody over a prisoner is temporary and extends only to the prosecution of the pending charges; the sending state retains custody over the prisoner for all other purposes.

*Obligations of the Receiving State and Remedies for the Prisoner*

Once the transfer process under the IAD has been set in motion, the IAD imposes certain requirements on the receiving state and provides a remedy to the prisoner if those requirements are not satisfied.

First, if the prisoner requests a transfer to the receiving state to dispose of charges underlying a detainer, but the receiving state declines to accept temporary custody of the prisoner for that purpose, the receiving state is to dismiss the charges with prejudice, and the detainer ceases to have any force or effect. Article V(c).[19]

Second, once a prisoner is transferred to the receiving state, the IAD requires the receiving state to dispose of any pending criminal charges before returning the prisoner to the sending state. Articles III(d), IV(e).[20] This requirement is often referred to as an "anti-

---

[17] CS §8-407(g).

[18] CS §8-407(e).

[19] CS §8-407(c).

[20] CS §§8-405(d), 8-406(e).

10

shuttling" provision. If the receiving state violates an anti-shuttling provision and returns the prisoner to the sending state without resolving the charges underlying the detainer, the receiving state is to dismiss the charges with prejudice and the detainer ceases to have any force or effect. *Id.*

Third, the IAD imposes speedy trial deadlines in the receiving state. If the prisoner initiated the transfer, the receiving state must bring the prisoner to trial within 180 days of receiving the prisoner's request under the IAD. Article III(a).[21] If the receiving state initiated the transfer, the trial must begin within 120 days of the prisoner's arrival in the receiving state. Article IV(c).[22] In either instance, the court presiding over the matter may grant "any reasonable and necessary continuance" beyond the deadline. Articles III(a), IV(c).[23] Also, the duration and expiration of those periods are "tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." Article VI(a).[24] However, if the receiving state otherwise does not bring the prisoner to trial on the charges underlying the detainer within the requisite time period, the receiving state is to dismiss those charges with prejudice. Article V(c).[25]

---

[21] CS §8-405(a).

[22] CS §8-406(c).

[23] CS §§8-405(a), 8-406(c).

[24] CS §8-408(a).

[25] CS §8-407(c).

11

*Applicability of the IAD to a Mentally Ill Prisoner*

Article VI of the IAD consists of two provisions that limit the application and remedies available under the IAD. As previously mentioned, the speedy trial requirements that the IAD imposes in the receiving state are tolled "for as long as the prisoner is unable to stand trial." Article VI(a). In addition, "[n]o provision of [the IAD], and no remedy made available by [the IAD], shall apply to any person who is adjudged to be mentally ill." Article VI(b).[26] As will be seen, this case requires us to consider the scope of the latter subsection.

*IAD Forms*

The National Association of Extradition Officials has developed forms that party states may use to implement the provisions of the IAD. *See* National Association of Extradition Officials*,* description of Extradition and Interstate Agreement on Detainers Manual *at* https://perma.cc/ZRW3-TLYY.[27] Following the pattern set by the IAD, these forms are designated by Roman numerals. Pertinent to this case, Form II is used by a prisoner to invoke the IAD to request final disposition of pending charges in another state. That form recites the provisions of Article III that the request constitutes a waiver of extradition to the receiving state and a consent to be returned to the place of imprisonment after the charges in the receiving state are resolved.

---

[26] CS §8-408(b).

[27] Congress has authorized the United States Attorney General and the Mayor of the District of Columbia to develop forms as well. 18 U.S.C. App. 2 §6.

12

**B.**     *Mental Status of a Defendant in a Criminal Case*

The mental status of a defendant in a criminal case may become an issue in that case primarily in two instances:  (1) whether the defendant is incompetent to stand trial; and (2) whether the defendant was not criminally responsible at the time of the crime.  Both concern the mental status of the defendant, but during different time periods, which may or may not overlap.

1.     Incompetent to Stand Trial

Under Maryland law, a defendant is incompetent to stand trial if the defendant is unable "to understand the nature or object of the proceeding" or "to assist in one's defense." CP §3-101(f).[28]  If at any time before or during trial the court suspects that the defendant is incompetent or if the defendant alleges incompetence, the court must determine whether the defendant is competent to stand trial.  CP §3-104(a).  The court may reconsider the issue of competence at any time before final judgment.  CP §3-104(c).  The statute provides ultimately for the dismissal of the charges if the defendant remains incompetent to stand trial for a specified period.  CP §3-107.  The prohibition against trying an incompetent defendant reflects the due process right to a fair trial under the Fourteenth Amendment of the United States Constitution.  *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975).

---

[28] This standard has been part of State law since the General Assembly adopted it by statute in 1967.  *Raithel v. State*, 280 Md. 291, 297-98 (1977).  Although this standard was not applied in Maryland prior to the General Assembly's action, it had been part of the common law of many other states.  *See* Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 454 (1967).

2.      Not Criminally Responsible

A defendant in a criminal case "is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to: (1) appreciate the criminality of that conduct; or (2) conform that conduct to the requirements of the law."  CP §3-109(a).[29]  A defendant who asserts that he or she lacked criminal responsibility at the time of the offense may enter a plea of "not criminally responsible."  CP §3-110(a); Maryland Rule 4-242(a).

If a defendant enters a plea of not criminally responsible, the State retains the burden of proving, beyond a reasonable doubt, that the defendant committed the criminal act.  CP §3-110(c).  The defendant bears the burden of proving, by a preponderance of the evidence, that he or she was not criminally responsible at the time of that act.  CP §3-110(b)-(c).  It is not uncommon, as happened in this case, for the defendant to admit to having committed the criminal act and for the trial to concern solely the issue of criminal responsibility.  Maryland Rule 4-314(a)(4).[30]

If the factfinder – either the jury or, in a bench trial, the judge – returns a verdict of not criminally responsible, "the court shall order the defendant committed to the facility that the Health Department designates for institutional inpatient care or treatment."  CP §3-

---

[29] This standard was adopted by the General Assembly in 1967 based on a provision of the Model Penal Code.  *See State v. Conn*, 286 Md. 406, 417 (1979).

[30] Alternatively, a defendant could enter a plea of not guilty and not criminally responsible.  In such cases, the trial may be bifurcated.  Maryland Rule 4-314(a)(1)-(3), (b).

112(b).[31]  The Department of Health must "admit the defendant to the designated health care facility as soon as possible, but not later than 10 business days" after receiving the order of commitment.  CP §3-112(e)(1).  As an alternative to commitment, the defendant may be released, with or without conditions, if certain criteria are met.  CP §3-112(g).  If committed to a facility, the defendant may be released if he or she "would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others."   CP §3-114(b).   The defendant may also be conditionally released after commitment if it is possible to satisfy that standard with conditions imposed by the court.  CP §3-114(c).  While on conditional release, the individual is still regarded as a "committed person" under the statutory scheme and may be returned to the mental health facility if the conditions are violated.  CP §3-121; *see also Simms v. Department of Health*, 467 Md. 238 (2020).

3.     Comparison

As is evident, the determination whether a defendant is competent to stand trial is distinct from the determination whether the defendant was criminally responsible at the time of the alleged offense.  For competency, the court must assess the defendant's *current* mental health status to determine whether the defendant is able to understand the

---

[31] At the time of the Circuit Court proceedings in this case in June 2018, the statute required the court to commit the defendant to the Health Department in somewhat different language.  The statute was amended during the 2018 session of the General Assembly, effective October 1, 2018, to its current form.  Chapters 188, 189, 702, 703, Laws of Maryland 2018.  The changes wrought by the 2018 amendment are not pertinent to the issues in this case.

proceedings and assist in the defense. For criminal responsibility, the court must assess the defendant's *past* mental health status at the time of the commission of the offense, which may or may not be the same as the defendant's mental health status at the time of trial. *See Jolley v. State*, 282 Md. 353, 373 (1978). When a defendant enters a plea of not criminally responsible, the court may order an evaluation of the defendant's competence to stand trial, presumably on the theory that whatever condition is the basis of that plea may have persisted and may affect the defendant's ability to assist in the defense. *See* CP §3-111.[32]

In any event, a defendant may be found competent to stand trial at present, yet deemed not criminally responsible for the past conduct at issue. Indeed, that is precisely what happened in the case at hand.

## B.   *Facts and Legal Proceedings*

The essential facts are undisputed and can be briefly summarized, along with the procedural path of this case.

### *Murder Charges in Maryland*

On March 17, 2016, Mr. Aleman fatally stabbed Victor Adolpho Serrano, his former landlord, at Mr. Serrano's home in Baltimore County. On March 18, 2016, an arrest warrant was issued for Mr. Aleman based on a statement of charges filed in the District

---

[32] CP § 3-111(a) provides that "[i]f a defendant has entered a plea of not criminally responsible, the court may order the Health Department to examine the defendant to determine whether the defendant was not criminally responsible under § 3-109 of this title and whether the defendant is competent to stand trial."

Court charging him with first degree murder of Mr. Serrano. However, Mr. Aleman had fled the State.

*Conviction and Imprisonment in Ohio*

Approximately two weeks later, Mr. Aleman was in Glendale, Ohio, where a police officer came upon him walking along a highway. When the officer approached, Mr. Aleman drew a knife and threatened the officer, causing the officer to shoot Mr. Aleman in an attempt to disarm and apprehend him. Mr. Aleman later explained to police in Ohio that "I don't want to kill somebody else. And I wanted the officer to kill me."

Mr. Aleman was tried in Ohio, where a jury found him guilty of felony assault. The Ohio court sentenced him to 11 years in prison.

*Mr. Aleman's IAD Request and Return to Maryland*

The Maryland arrest warrant was lodged as a detainer against Mr. Aleman in Ohio. On September 26, 2016, while serving his sentence in Ohio, Mr. Aleman filed a request under Article III of the IAD for final disposition of the outstanding murder charge in Maryland. Mr. Aleman filed his request on IAD Form II, in which he acknowledged that he waived extradition to Maryland for disposition of the pending charge and consented to be returned to Ohio following resolution of those charges.

Maryland agreed to take temporary custody of Mr. Aleman under the IAD. He was transferred from Ohio, the sending state, to Maryland, the receiving state, on November 17, 2016. On December 5, 2016, the grand jury in the Circuit Court for Baltimore County returned an indictment that superseded the statement of charges and charged him with first

degree murder, first degree assault, robbery with a deadly weapon, robbery, theft, and carrying a dangerous weapon with intent to injure – all related to his attack on Mr. Serrano.

*Trial in Maryland – Verdict of Not Criminally Responsible*

In the Circuit Court, Mr. Aleman initially entered pleas of not guilty and not criminally responsible with respect to the charges against him. The Circuit Court ordered, pursuant to CP §3-111(a), an examination of Mr. Aleman with respect to his competency to stand trial and criminal responsibility. After examining Mr. Aleman, the Department of Health provided a report to the court on his mental status. Based on that report, the court found him competent to stand trial.

The prosecution and defense agreed to bifurcate the issues of whether Mr. Aleman had committed the acts alleged and whether he was criminally responsible for those acts. On February 23, 2018, Mr. Aleman pled guilty to second degree murder of Mr. Serrano under the first count of the indictment. (The State later *nolle prossed* the remaining charges). The Circuit Court scheduled the trial on the issue of criminal responsibility for a later date.[33]

Mr. Aleman ultimately elected to have the issue of criminal responsibility decided by a jury. At the jury trial on May 29-31, 2018, the parties presented a stipulation of facts about the underlying offense and a video recording of an encounter between Mr. Aleman and the victim earlier on the day of the murder that had been captured by a surveillance

---

[33] Mr. Aleman had waived the requirement under State law for speedy trial pursuant to the State "Hicks rule." *See Tunnell v. State*, 466 Md. 565 (2020).

18

camera. The prosecution and the defense each presented the testimony of a forensic psychiatrist. Both psychiatrists diagnosed Mr. Aleman as suffering from a schizo-affective disorder, but reached divergent opinions on whether he was criminally responsible at the time of the offense. The jury found by a preponderance of the evidence that Mr. Aleman was not criminally responsible for the killing of Mr. Serrano. Immediately following the jury verdict, the Circuit Court indicated that it would commit Mr. Aleman to the Department of Health. However, upon being advised that Mr. Aleman had been brought to Maryland under the IAD, the court expressed the view that he would have to be returned to Ohio and remanded him to the county detention center.

On June 4, 2018, the Circuit Court entered an order committing Mr. Aleman to the Department of Health pursuant to CP §3-112 with the date of transfer and place of commitment "to be determined." At the same time, the Circuit Court sent a letter to the Secretary of Health, with copies to the attorneys involved in the case, as well as attorneys representing the Maryland Department of Public Safety and Correctional Services and the Maryland Department of Health, and an official of the Ohio Department of Rehabilitation & Correction. That letter summarized the proceedings in the Circuit Court, noted that Mr. Aleman had been brought to Maryland while serving a sentence in Ohio, and provided copies of the pertinent IAD forms concerning Mr. Aleman's temporary custody in Maryland.[34]

---

[34] There is no indication in the record whether the Secretary responded to this letter. In his brief, Mr. Aleman states that the Ohio official shown as copied on the letter to the

19

*Mr. Aleman's Habeas Corpus Petitions and Appeals*

Two days later, on June 6, 2018, Mr. Aleman filed a Petition for Writ of Habeas Corpus in the Circuit Court for Baltimore County in which he challenged his continued confinement in the county detention center and asked to be committed to the Department of Health. He argued that the Maryland jury's determination that he was not criminally responsible at the time of the March 2016 offense placed him outside the purview of the IAD, pursuant to Article VI(b) of the IAD, and, accordingly, that he should not be returned to Ohio's custody. The State opposed the petition, arguing that the IAD required his return to Ohio.

The Circuit Court held a hearing on June 13 and, concluding that the IAD required Mr. Aleman's return to Ohio, denied the relief sought in his habeas corpus petition. Mr. Aleman immediately noted an appeal and asked the court to stay his return to Ohio pending his appeal. The Circuit Court granted that request, staying its order committing Mr. Aleman to the Department of Health, as well as the denial of his habeas corpus petition and his return to Ohio,[35] with the result that Mr. Aleman remained in the county detention

---

Secretary did not take action in response to the letter. In any event, the IAD does not require that a sending state request return of a prisoner from the receiving state.

[35] The State sought reconsideration of the order staying his return to Ohio on the ground that the denial of the habeas corpus petition was not appealable. Mr. Aleman opposed that motion on the basis that, while an order denying habeas corpus relief is ordinarily not appealable, there is an exception when the writ is sought "for a purpose other than to challenge the legality of a conviction or sentence" – in this case, commitment to the Department of Health rather than detention for return to Ohio. CP §7-107. The Circuit Court denied the motion to reconsider and the Court of Special Appeals agreed with Mr.

center pending the disposition of his appeal.[36]

Shortly thereafter, on June 18, 2018, Mr. Aleman filed a second petition for habeas corpus, seeking to compel the State to transfer him to the Department of Health pending his appeal of the denial of his first habeas corpus petition. A hearing was held on July 20, 2018, before a different judge of the Circuit Court, who denied the second petition. Mr. Aleman again noted an appeal.

The Court of Special Appeals consolidated Mr. Aleman's two appeals and affirmed the judgment of the Circuit Court.[37] 242 Md. App. 632 (2019). The intermediate appellate court held that, under the IAD, Maryland acquired temporary custody over Mr. Aleman only to prosecute the charges on which the detainer was based and therefore lacked custody over Mr. Aleman to commit him to the Department of Health before returning him to Ohio under the IAD. The Court of Special Appeals held that Article VI(b) of the IAD did not require otherwise.

We granted Mr. Aleman's petition for a writ of *certiorari*.

_____

Aleman on the issue of appealability. 242 Md. App. at 636 n.2. Before us, the State does not contest the appealability of the order.

[36] We note that, under Article V(f) of the IAD (CS §8-407(f)), Mr. Aleman is to receive credit on his Ohio sentence for the time served in temporary custody in Maryland. Whether he will receive good time credits as well is to be determined under Ohio law.

[37] The Court of Special Appeals ultimately held that Mr. Aleman's appeal of the denial of his second habeas corpus petition was moot as a result of its decision affirming the denial of his first petition. 242 Md. App. at 636 n.3.

## II

## Discussion

There appears to be no dispute that, if Mr. Aleman had been either acquitted or convicted of the Maryland charges, he would be promptly returned to Ohio under the IAD. The question in this case is whether a verdict of not criminally responsible requires a different result.

Mr. Aleman offers two arguments as to why he should remain in Maryland following the not criminally responsible verdict. First, he suggests the IAD contemplates that Maryland's "temporary custody" of him pursuant to Articles III and V to resolve the charges underlying the detainer against him would also include a commitment to the Department of Health under CP §3-112. Alternatively, he argues that the not criminally responsible verdict took him outside the purview of the IAD altogether – *i.e.*, that, under Article VI(b), the IAD effectively switches off once such a verdict is returned.

### A. *Standards of Appellate Review and Statutory Construction*

The consequences of a not criminally responsible verdict when the State has temporary custody of the defendant under the IAD is a legal question. As with any legal question, we owe no deference to the decisions of the Circuit Court or of the Court of Special Appeals. However, that does not mean that we need to re-invent the wheel when, as in this case, the intermediate appellate court has cogently analyzed an issue.

The question in this case requires interpretation of an interstate compact and, to some extent, a State statute. The goal of statutory interpretation, as this Court has repeatedly stated, is to discern and carry out the intent of the Legislature. We begin with

22

an examination of the text of a statute within the context of the statutory scheme to which it belongs, then typically review the legislative history to confirm conclusions or resolve ambiguities, and finally may consider the consequences of alternative interpretations of the statute. *Blue v. Prince George's County*, 434 Md. 681, 689 (2013) (citing *Town of Oxford v. Koste*, 204 Md. App. 578, 585-86 (2012), *aff'd*, 431 Md. 14 (2013)). In construing statutes, we presume that the Legislature intended for its enactments to work together as a harmonious and consistent body of law. *Lockshin v. Semsker*, 412 Md. 257, 276 (2010).

Prior case law construing the statute in question or similar statutes in other jurisdictions is often informative. *State v. Thomas*, 465 Md. 288, 301 (2019). That is particularly true in this case. As noted above, as a congressionally-sanctioned interstate compact, the IAD is a federal law subject to construction by the federal courts as well as a state law of the other states that have joined the compact.

## B. *Whether Temporary Custody under the IAD May Include Commitment to the Department of Health*

Mr. Aleman argues that commitment to a mental health facility in Maryland under CP §3-112 is not precluded by the provisions of the IAD that require his return to the sending state – Ohio. But, as the Court of Special Appeals aptly observed, Maryland is able to commit a defendant under CP §3-112 *only if* the State has the requisite jurisdiction over that defendant to do so. 242 Md. App. at 644. The question then is whether temporary custody afforded by the IAD to a receiving state provides such jurisdiction.

23

*Statutory Text*

Maryland's custody of Mr. Aleman is based on its status as a receiving state under the IAD as a result of his invocation of the IAD. As previously outlined, in making a request to resolve an out-of-state detainer, a prisoner is deemed under Article III to waive extradition to the state that placed the detainer and, once the detainer is resolved, to consent to be returned to the place of incarceration.[38] The IAD specifies that a receiving state takes "temporary custody" of the prisoner – a phrase that appears 13 times in the compact.

The custody of the prisoner in the receiving state is not only temporary, but is limited in nature. That custody is "only for the purpose of permitting prosecution" of untried charges. Article V(d).[39] For all other purposes, "the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state" – in Mr. Aleman's case, Ohio. Article V(g).[40] Moreover, the receiving state is to return the prisoner to the sending state "[a]t the earliest practicable time consonant with the purposes of [the IAD]" – *i.e.,* to resolve pending detainers. Article V(e).[41] As is evident, the plain language of the IAD leaves no doubt that the receiving state has custody of a prisoner only for the purpose of resolving pending charges.

---

[38] The IAD Form II that Mr. Aleman executed to trigger his transfer to Maryland recited these provisions of Article III of the IAD in some detail.

[39] CS §8-407(d).

[40] CS §8-407(g).

[41] CS §8-407(e).

*Legislative History*

The history and purpose of the IAD confirm what the text plainly says about the nature of a receiving state's custody of a prisoner. As noted earlier, the drafters of the IAD designed the compact according to certain guiding principles. In addition to requiring prompt action by law enforcement and correctional officials to resolve detainers, those principles stressed the temporary nature of the receiving state's custody of the prisoner: "There should be assurance that any prisoner released to stand trial in another jurisdiction will be returned to the institution from which he was released" and "it is essential that the institution [in the sending state] be assured of [the prisoner's] return after the trial has been completed." Council of State Governments Report at 75. From its inception, the IAD was intended to give states with pending charges against prisoners in other states only temporary custody over those prisoners for the limited purpose of resolving the pending charges.

When the IAD was proposed for adoption by the Maryland General Assembly in the early 1960s, the Legislative Council provided the following description of the operation of the compact when it recommended its adoption:

> [The IAD] provides a means whereby [a prisoner] can test the substantiality of detainers placed against him and can secure final judgment on indictments outstanding against him in party states. The prisoner will benefit from having a greater degree of certainty concerning his future than he now has. It will be of benefit to Maryland correctional authorities in that they will be able to provide more suitable programs of treatment for the prisoner while he is incarcerated.

Legislative Council of Maryland, Report to the General Assembly of 1964, p. 36.

25

The history of the federal legislation adopting the compact several years later reflects the same understanding. In discussing how the IAD would operate, the floor leader of the bill in the House of Representatives explained that "[u]pon completion of the trial the prisoner would be returned to the institution in which he was imprisoned. If convicted, any sentence imposed would be served in the second jurisdiction following completion of the original sentence." 116 Cong. Rec. 13999 (1970) (remarks of Rep. Kastenmeier). The same understanding is reflected in a contemporaneous congressional report on the bill describing a twofold purpose of the IAD – (1) to provide prisoners with a way to promptly "test of the substantiality of detainers placed … by other jurisdictions;" and (2) to provide prosecuting authorities a way to bring a defendant imprisoned in another jurisdiction to trial before the case had grown stale. S. Rep. No. 91-1356 (1970). Both purposes are satisfied once the receiving state's case has been tested at trial, as there are no longer unsubstantiated charges pending against the prisoner, and the receiving state no longer risks evidence becoming stale.

Mr. Aleman contends that "temporary custody" under the IAD should be given a broader interpretation based on the expressed concern of the drafters of the IAD about the adverse effect of unresolved detainers on the rehabilitation of a prisoner in the place of incarceration. Mr. Aleman argues that, because Article V(e) of the IAD states that the receiving state is to return a prisoner to the sending state at "the earliest practicable time consonant with the purposes of this Agreement," Maryland may refrain from returning him to Ohio and instead commit him to the Department of Health in order to further his rehabilitation. However, as the Court of Special Appeals observed, the IAD is not designed

26

to promote prisoner rehabilitation in a general sense, but rather is intended to minimize the negative impact of unresolved detainers on a prisoner's rehabilitation while incarcerated in the sending state. *See* 242 Md. App. at 652-53. Any impediment that the unresolved Maryland detainer might have posed to Mr. Aleman's participation in a rehabilitation program in Ohio has now been resolved, in accordance with the design of the IAD.

*Testing Alternative Constructions*

Mr. Aleman's alternative interpretation of the IAD is that it allows commitment to the Department of Health as "intrinsic" to the disposition of the charges against him in Maryland. In his view, Maryland's temporary custody would extend to his indefinite commitment to a mental health facility under CP §3-112.

But a commitment under CP §3-112 appears to be no more intrinsic to the trial of the charges in the receiving state than other post-trial dispositions.[42] If the prisoner is

---

[42] Mr. Aleman offers a "plain meaning" argument based on the use of the word "shall" in CP §3-112 ("…the court shall order the defendant committed…"). He asserts that use of that verb means that the Circuit Court was required to commit him to the Department of Health and had no discretion to do otherwise. There are at least two problems with this argument. First, the IAD also uses the verb "shall" in describing the receiving state's obligation to return a prisoner to the sending state after charges are resolved. Article V(e). Second, many Maryland statutes concerning sentencing also use the verb "shall" to describe the imposition of sentence. *See, e.g.,* Maryland Code, Criminal Law Article, §2-201(b) (defendant convicted of murder in first degree "shall be sentenced to" imprisonment for life); §4-203(e)(1)(ii) (defendant convicted of firearms offense on public school property "shall be sentenced to imprisonment for not less than 90 days"); §5-612(c) (defendant convicted as volume dealer of certain illegal drugs "shall be sentenced to imprisonment" for at least five years). However, there is no dispute that, if Mr. Aleman had been convicted and received a sentence of imprisonment in Maryland, he would be returned to Ohio before commencing his Maryland sentence. CP §3-112 and the IAD cannot be harmonized by arbitrarily according precedence to the use of "shall" in one statute rather than the other.

acquitted of charges in the receiving state, the prisoner is not released in that state, but rather returned to the sending state to complete the existing sentence there. If the prisoner is convicted and sentenced in the receiving state, that sentence must await completion of the prisoner's existing sentence in the sending state. *See State of N.Y. by Coughlin v. Poe*, 835 F. Supp. 585, 590-91 (E.D. Ok. 1993) (holding that the receiving state was obligated under the IAD to return the prisoner to the sending state to serve the remainder of his sentence there before the receiving state could carry out the death sentence it had imposed). It follows that, if a prisoner is found guilty but not criminally responsible in the receiving state, any commitment for treatment must likewise await completion of the original sentence in the sending state.[43]

A contrary interpretation would have anomalous results. For example, under Maryland law, a defendant found to be not criminally responsible may be released with conditions if the court determines that he or she is not a danger to self or to the person or property of others. *See* CP §§3-112(g), 3-114. A person on conditional release is still considered a "committed person." *See* CP §3-121. Under Mr. Aleman's view of temporary custody under the IAD, a defendant found not criminally responsible like Mr. Aleman

---

[43] Mr. Aleman argues that, under Maryland Rule 4-314, the guilt and criminal responsibility phases of a bifurcated trial are "a single continuous trial in two stages." While that may be a correct description of the operation of the rule, it is without consequence here. The jury's determination that a defendant is not criminally responsible is separate from the court's decision to commit or to release the defendant, with or without conditions, as a result of that verdict.

could be committed and then released into the community in Maryland on conditions for an indeterminate time without being returned to Ohio to complete his sentence.[44]

*Summary*

Ohio had complete and exclusive custody of Mr. Aleman before Mr. Aleman invoked the IAD to resolve his Maryland detainer. Under the plain language of the IAD, and consistent with the purpose of the compact as reflected in its legislative history, Maryland obtained temporary custody of Mr. Aleman for the sole purpose of resolving the pending murder charge underlying the detainer – in response to his request that it do so. Maryland was obligated to return Mr. Aleman to Ohio once that charge was resolved – whatever that resolution happened to be. Accordingly, Maryland does not have the requisite jurisdiction over Mr. Aleman to commit him to the Department of Health under CP §3-112 in lieu of returning him to Ohio.

## C. *Whether the Not Criminally Responsible Verdict Triggered Article VI(b)*

Mr. Aleman's second argument does not depend on harmonizing CP §3-112 with the temporary custody provisions of the IAD. Rather, he contends that, once the jury

---

[44] Perhaps in light of this potential anomaly, counsel for Mr. Aleman stated at oral argument that a defendant who is found not criminally responsible and who is conditionally released would have to be returned to the sending state. However, this appears to be at odds with the argument that commitment for treatment falls within the temporary custody that a receiving state has under the IAD. An individual on conditional release not only remains a "committed person" in that status, but is also subject to confinement in a mental facility if he or she violates a condition of the conditional release. CP §3-121. Mr. Aleman's conception of temporary custody, which apparently would involve confinement in Ohio at the same time as commitment under Maryland law, thus raises the possibility that the sending and receiving states would simultaneously exercise competing forms of custody over the individual – a situation the IAD was clearly designed to avoid.

29

returned a not criminally responsible verdict, the IAD ceased to apply to him pursuant to Article VI(b) of the compact. Under this view, Article VI(b) creates a mental health exception to the IAD and a not criminally responsible verdict at the conclusion of a trial in the receiving state would preclude the prisoner's return to the sending state. Therefore, Mr. Aleman argues, he should not be returned to Ohio, but rather retained in Maryland and committed to the Department of Health under CP §3-112.[45]

*Text of Article VI(b)*

Article VI(b) of the IAD states, in its entirety, that "[n]o provision of this Agreement, and no remedy made available by this Agreement, shall apply to any person who is adjudged to be mentally ill." The compact does not define what is meant by a "person who is adjudged to be mentally ill." However, as the Court of Special Appeals noted, tense matters. *See* 242 Md. App. at 647-48. This provision uses the present tense – "any person who is adjudged *to be* mentally ill" – as opposed to the present perfect tense – "any person who is adjudged *to be or to have been* mentally ill." In our view, the text of Article VI(b) indicates that the IAD and its remedies do not apply when a prisoner *currently* suffers from a mental illness.

An example of an adjudication of current mental illness that would come within Article VI(b) is when the prisoner is found to be incompetent to stand trial. In assessing

---

[45] It is not at all clear that, if the IAD were to switch off as Mr. Aleman argues it should, he would be retained in Maryland. Maryland has temporary custody of Mr. Aleman only by virtue of the IAD and a reasonable argument could be made that, once the IAD ceases to operate, full custody of Mr. Aleman necessarily reverts to Ohio – the State that, but for the IAD, would have custody of him.

30

competency, a court considers a defendant's *current* mental state – whether he or she is able to understand the proceedings and assist in his or her own defense. By contrast, an adjudication that one was not criminally responsible due to mental illness at the time of the crime in question – necessarily a time in the past – does not alone suffice to satisfy this provision.

As this case illustrates, a defendant may be currently competent to stand trial, yet found not responsible for past criminal conduct because of a mental disorder at the time of the offense. There may be other bases for finding that a prisoner is currently mentally ill within the meaning of Article VI(b), but a not criminally responsible verdict by itself does not suffice, because it does not involve an adjudication of present mental illness.

The reference to "remedies" in Article VI(b) also evidences the provision's concern with current mental illness. As outlined above, the IAD provides a prisoner with the remedy of dismissal with prejudice of charges underlying a detainer, thereby negating the detainer, in three circumstances: (1) when the receiving state declines to accept temporary custody of a prisoner who invokes the IAD; (2) when the receiving state violates the IAD's anti-shuttling provisions by returning the prisoner to the sending state without resolving the charges underlying a detainer; and (3) when the receiving state fails to bring the prisoner to trial within the period specified by the IAD's speedy trial requirements.[46]

---

[46] Of course, none of these remedies would apply at this stage of Mr. Aleman's case: Maryland accepted custody of Mr. Aleman after he invoked the IAD, the charges underlying the Maryland detainer have been resolved before his return to Ohio, and there is no contention that the IAD's speedy trial requirements were violated.

31

Article VI(b) recognizes that it would be futile, or an injustice, to apply these remedies in the case of a prisoner who is currently incompetent to stand trial. A few hypothetical examples illustrate this point. Imagine a prisoner in Ohio, who is determined to be currently incompetent, for whom there is a detainer based on pending Maryland charges. Suppose further that the prisoner nevertheless executes an IAD Form II requesting transfer to Maryland under Article III of the IAD to dispose of the charges underlying the detainer. It would be futile to transfer to Maryland a prisoner who is incompetent to stand trial and Article VI(b) makes clear that the Maryland charges would not have to be dismissed if Maryland declined to accept that transfer. If a prisoner were transferred to Maryland, determined to be incompetent to stand trial on arrival, and Maryland returned the prisoner to Ohio without resolving the charges, Article VI(b) would allow that return without dismissal of those charges for violation of the anti-shuttling provision. If a prisoner was transferred to Maryland under the IAD and found incompetent, but it appeared that competency might soon be restored and a trial could go forward although after the expiration of the IAD speedy trial limit, Article VI(b) would allow that to happen without dismissal of the charges under the IAD's speedy trial provisions.

Mr. Aleman argues that a not criminally responsible verdict suffices to establish a current mental illness because it creates an inference that a defendant remains mentally ill during and after that prosecution. He relies on *Jones v. United States*, 463 U.S. 354 (1983), in which the Supreme Court held that a statute that required commitment to a mental hospital of a defendant following a verdict of not guilty by reason of insanity did not violate the constitutional guarantees of due process or equal protection. In reaching that holding,

the Court reasoned that the finding beyond a reasonable doubt that a defendant had committed the criminal act indicated that the defendant was dangerous and that the legislature could reasonably determine that the insanity verdict by a lesser standard of proof supported an inference of continuing mental illness. The Court acknowledged that the strength of an inference of continuing mental illness would vary from case to case. In any event, we agree with the Court of Special Appeals that Article VI(b) "is triggered by an adjudication of an actual present mental illness, not an adjudication that at best creates an inference of present mental illness." 242 Md. App. at 650-51. This inference, coupled with the determination of dangerousness, may be sufficient to support a commitment of a defendant like Mr. Aleman, but it does not take him – and every other defendant who is found not criminally responsible – outside the IAD.[47]

*Statutory Context*

Article VI(b) should, of course, also be read in the context in which it appears in the compact. Perhaps most pertinent, there is another subsection in Article VI. Subsection (a) states, in its entirety, that "[i]n determining the duration and expiration dates of the time periods provided [in Articles III and IV of the IAD], the running of these time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by

---

[47] Again, we note that Mr. Aleman's argument raises the prospect that a defendant in such a case might ultimately be determined not to be dangerous – a necessary prerequisite for commitment under both *Jones* and CP §3-112 – but that the inference of continuing mental illness would keep him outside the IAD. In such circumstances, Mr. Aleman would be released in Maryland without commitment and his return to Ohio would be precluded by Article VI(b). We cannot accord the compact such an illogical reading. See footnote 44 above.

the court having jurisdiction of the matter." Article VI(a).[48] Subsection (a) thus tolls the IAD's speedy trial requirements when a prisoner is unable to stand trial. Subsection (b) speaks to a similar concern for a situation where the IAD's mechanisms and remedies for resolving outstanding detainers would be frustrated because the prisoner is currently mentally ill – for example, incompetent to stand trial to resolve the charges underlying the detainer.

In addition to being read as a cohesive whole, Article VI must be harmonized with the overall design of the compact. The IAD establishes a mechanism by which a state with charges pending against a prisoner in another state obtains that prisoner to resolve the open charges, either at the request of the prisoner or of the receiving state. As established in the previous section of this opinion, the text of the IAD and its legislative history make clear that a receiving state's custody over a prisoner pursuant to the IAD extends only to the resolution of pending charges in the receiving state. Nothing in Article VI(b) or elsewhere in the IAD suggests that an adjudication of a prisoner's past mental illness halts the operation of the IAD and strands the prisoner in the receiving state.

*Legislative History of Article VI(b)*

Most of the legislative history of the IAD speaks only cryptically with respect to Article VI(b), but the Senate Judiciary Committee Report issued in conjunction with the federal government's adoption of the IAD provides some evidence of the drafters' intent. S. Rep. No. 91-1356 (1970). That report outlined the purpose of the compact, its operation,

---

[48] CS §8-408(a).

and the allocation of costs of its operation. After noting that the IAD provided a prisoner with "a procedure for bringing about a prompt test of the substantiality of detainers placed against him by other jurisdictions," the report explained why a prosecuting jurisdiction might choose to invoke the compact – an option that was qualified in two respects, one of which related to a prisoner's mental illness. The report stated: "[t]he Agreement also provides a method whereby prosecuting authorities may secure prisoners serving sentences in other jurisdictions for trial before the expiration of their sentences and before the passage of time has dulled the memory or made witnesses unavailable. However, a governor's right to refuse to make a prisoner available is preserved and the Agreement does not apply to persons adjudged to be mentally ill." *Id.* As is evident, the Judiciary Committee referred to Article VI(b) as one of two exceptions to a receiving state's ability to obtain a prisoner for trial – the other exception being if the sending state's governor denies the receiving state's request. That understanding is consistent with the interpretation of the language of Article VI(b) articulated above – *i.e.,* that it was intended to avoid sending a prisoner who is mentally ill to the receiving state to no purpose, as a trial would not be able to take place.

*Interpretation of Article VI(b) in Other Jurisdictions*

There is little case law construing Article VI(b). In the few cases that have considered the application of Article VI(b), the courts have viewed the provision as relating to the current mental condition of a prisoner at the time an initial transfer is requested under the IAD. In any event, no case from any jurisdiction has interpreted Article VI(b) to block the return of a prisoner to the sending state because the prisoner was found not criminally responsible for a past offense in the receiving state.

35

For example, in *State v. Beauchene*, 541 A.2d 914 (Me. 1988), the defendant was found not guilty by reason of mental disease or defect on a murder charge in Maine and committed there for mental health treatment. Eight years later, however, he escaped from the mental health facility in Maine and fled to New York. While in New York, he committed crimes for which he was convicted and incarcerated in New York. Maine requested temporary custody under the IAD to resolve the escape charge, and the defendant was transferred from New York to Maine. After his return to Maine, the defendant was convicted of the escape charge. The defendant appealed that conviction, contending, among other things, that his previous commitment for mental health treatment in Maine triggered Article VI(b) and rendered him ineligible for the transfer from New York to Maine under the IAD. The Supreme Court of Maine rejected this argument, holding that the "purpose of Article VI(B) ... is clearly to prevent one state from gaining custody of an individual in another state who *at that time is mentally ill* and therefore unable to defend against the custody change effectively." *Beauchene,* 541 A.2d at 917 (emphasis added). Because the defendant had not been adjudged mentally ill in New York at the time when Maine sought custody of him to resolve the detainer based on the escape charge, Article VI(b) was not triggered. *Id.* at 917-18.

In *State v. King*, 733 P.2d 472 (Or. 1987), the defendant, who was imprisoned in Washington and subject to an Oregon detainer, was transferred from Washington to Oregon pursuant to the IAD. In Oregon, he was brought to trial and convicted of the charges underlying the Oregon detainer. On appeal, he raised several issues related to his transfer under the IAD. Among other things, he asserted that he should have been returned to

36

Washington for a determination of his mental status for purposes of Article VI(b). The intermediate appellate court in Oregon rejected that argument, noting that he had been found competent to stand trial in Oregon and that, in any event, the exception in Article VI(b) applies only to prisoners present in the sending state prior to transfer. *King,* 733 P.2d at 477-78.[49]

*Summary*

The plain language of Article VI(b), read in context and in light of the IAD's legislative history, provides that the IAD and its remedies do not apply when a prisoner suffers from a current mental illness that would interfere with the IAD's purpose of resolving the charges underlying an outstanding detainer. A not criminally responsible verdict in the receiving state concerning the defendant's mental status at the time of a past offense does not by itself trigger Article VI(b). It is apparent that Article VI(b) functions as a safeguard against subjecting a prisoner who is presently mentally ill to unnecessary transfers between jurisdictions that would not resolve charges underlying a detainer.

In this case, the Circuit Court explicitly found Mr. Aleman competent to stand trial (and implicitly did so when it accepted his guilty plea and reviewed with him his decision not to testify at trial). As best we can tell from the record of this case, he has never

---

[49] A New Jersey regulation implementing the IAD in that state reflects a similar interpretation. *See* New Jersey Administrative Code 10A:10-4.3. That regulation establishes four criteria to be satisfied in order for a prisoner or a prosecuting authority to initiate a transfer under the IAD. One of those criteria is that the "inmate against whom the detainer has been filed is not adjudged to be mentally ill." The regulation relates Article VI(b) to the initial transfer to the receiving state under the IAD – not the return to the sending state following resolution of a detainer.

contended otherwise. The jury's verdict that Mr. Aleman was not criminally responsible concerned his mental state at the time he committed the murder of Mr. Serrano in 2016, and not his mental state several years later when it was time to return him to the sending state under the IAD. Article VI(b) does not prevent his return to Ohio.

### III

### Conclusion

For the reasons set forth above, we hold:

(1) The IAD gives a receiving state limited temporary custody of a prisoner for the sole purpose of resolving charges underlying a detainer. Accordingly, Maryland lacks the requisite jurisdiction over Mr. Aleman to commit him to the Department of Health under CP §3-112.

(2) A verdict of not criminally responsible in a receiving state does not by itself render the IAD inapplicable to a prisoner under Article VI(b). Because the charges underlying the Maryland detainer pertaining to Mr. Aleman have now been resolved, the IAD requires his return to Ohio to serve the remainder of his sentence there.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

38

Circuit Court for Baltimore County
Case No. 03-K-16-006061
Case No. 03-C-18-006040
Argued: March 10, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 60

September Term, 2019

_____

PABLO JAVIER ALEMAN

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Dissenting Opinion by Getty, J.,
which Watts, J., joins.

_____

Filed: June 30, 2020

Respectfully, I dissent.

The Majority's narrow reading of Article VI(b) does not comport with this Court's present—and ever-changing—understanding of the effects of mental illness in individuals or the intent of the General Assembly in enacting the IAD and CP § 3-112. A not criminally responsible verdict necessarily means that Mr. Aleman is a "person who is adjudged to be mentally ill." CS § 8-408(b). Therefore, in my view, the IAD must be tolled and Mr. Aleman committed to an MDH facility for treatment, not returned to Ohio.

**A.      *To Be, Or To Have Been, That Is Not the Question.***

The Majority's analysis of Article VI(b) hinges predominantly on the verb tense used therein. In essence, the Majority contends that the IAD drafters' use of the present tense, as opposed to the present perfect tense, requires an adjudication of "current mental illness" for the IAD and its remedies not to apply. *See* Majority Slip Op. at 30–33. However, "statutes are generally not to be construed by strict and critical adherence to technical grammatical rules." 73 Am. Jur. 2d *Statutes* § 131. Resorting to statutory microanalysis, the Majority unduly concentrates on verb tense as a restraint on the broad application of remedies and treatments reserved for mentally ill individuals. The result constrains the designation of a mental illness to a fixed point in time—the commission of a criminal act—in disregard for the lodestar of statutory interpretation: "to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). Instead, in my view, the Court should not cast aside the clear intention of the General Assembly for sheer grammaticality. This rings especially true where a statute "shall be liberally construed so as to effectuate its purposes." CS § 8-411.

The General Assembly enacted the IAD to facilitate "the expeditious and orderly disposition" of untried charges of persons in other jurisdictions because such charges "obstruct programs of prisoner treatment and rehabilitation." CS § 8-403; *see also State v. Pair*, 416 Md. 157, 162 (2010) ("In short, the purpose of the IAD is to facilitate speedy disposition of charges underlying detainers."). Article V of the IAD details the temporary custody arrangement between the sending and receiving states. CS § 8-407. Tellingly, CS § 8-407(e) mandates the return of a prisoner to the sending state, "[a]t the earliest practicable time *consonant with the purposes of*" the IAD—i.e., the expeditious disposition of untried charges to advance prisoner treatment and rehabilitation. CS § 8-407(e) (emphasis added). And, of import here, CS § 8-408(b) precludes application of the IAD and its remedies "to any person who is adjudged to be mentally ill." Maryland's commitment statute requires that a defendant deemed not criminally responsible be committed to an MDH facility for treatment. *See* CP § 3-112 ("[A]fter a verdict of not criminally responsible, the court *shall* order the defendant committed to the facility that the Health Department designates for institutional inpatient care or treatment." (emphasis added)).

Accordingly, CS § 8-408 (concerning a person adjudged to be mentally ill) and CP § 3-112 (concerning the effects of a not criminally responsible verdict) embrace a similar topic: the proper treatment of individuals with mental illness. In cases such as these,

> [i]t is well settled in this State that when two acts of the General Assembly covering similar subject matter make no reference to each other, if it is at all feasible, they will be construed so as to give as full an effect to each other as

2

possible. In order for one statute to alter or limit another, the intention of the Legislature to do so must be clear and manifest; otherwise, the requirements of one will be construed as embodying the provisions of the other.

*Mayor & City Council of Balt. v. Clerk of Superior Court*, 270 Md. 316, 319 (1973) (citation omitted). Here, the General Assembly gave no clear expression of intent to render CP § 3-112 inapplicable when a defendant is present in Maryland because of the IAD. Instead, the express terms of CS § 8-408(b) suspend the IAD when an individual is "adjudged to be mentally ill." Read together, these statutory provisions require an individual deemed not criminally responsible be committed to an MDH facility for treatment—and the IAD suspended—until the individual is adequately rehabilitated and fit for return to the sending state. This result comports with our developing societal and scientific understanding of mental illness.

**B.      *Mental Illness as a Continuing Ailment.***

In *Jones v. United States*, the Supreme Court determined that a not guilty by reason of insanity verdict provided a satisfactory foundation for an individual's commitment. 463 U.S. 354, 366 (1983). An "insanity acquittal," the Court reasoned, "supports an inference of continuing mental illness." *Id.* "It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment." *Id. Jones* stands for the unremarkable proposition that an individual found not criminally responsible has a *continuing* mental illness; ostensibly, this means from the time of the not criminally responsible finding to the present.

Indeed, this Court recently reaffirmed the notion that an individual "convicted of a crime yet found not criminally responsible for its commission is presumed dangerous."

3

*Simms v. Dep't of Health*, 467 Md. 238, 255 (2020); *see Bergstein v. State*, 322 Md. 506, 519 (1991) ("The finding [that a person is not criminally responsible] presupposes that he committed an illegal act. Inherent in this inference is the indicia of continuing dangerousness." (alteration in original)); *Jones*, 463 U.S. at 364 ("The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness.").

It follows, then, that Mr. Aleman is "adjudged to be mentally ill" pursuant to CS § 8-408(b). The jury's not criminally responsible verdict undoubtedly means that Mr. Aleman suffered from a mental illness severe enough to lead him to commit a crime. Because a person whose mental illness drives him or her "to commit a criminal act is likely to remain ill and in need of treatment," *Jones*, 463 U.S. at 366, the illness is continuing in nature. It stands to reason that given this understanding, Mr. Aleman's mental illness—clearly established at the time of the crime—continues through and beyond the not criminally responsible verdict.

Therefore, I would reverse the judgment of the Court of Special Appeals and hold that Maryland possesses the requisite jurisdiction to commit Mr. Aleman to an MDH facility and that a not criminally responsible verdict necessitates the application of the tolling provision contained in CS § 8-408(b).